***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Houser, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties to this matter have been properly named.
2. The date of injury at issue in this claim is October 28, 1999.
3. Plaintiff contends that on October 28, 1999, he sustained an injury to his left elbow during the course of his employment.
4. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act
5. An employer-employee relationship existed between plaintiff-employee and Borg Warner on October 28, 1999.
6. Kemper Insurance Company was the carrier on the risk.
7. Plaintiff is not receiving temporary total disability benefits at this time, and has not been paid any temporary total disability since October 28, 1999.
8. Plaintiff's average weekly wage shall be determined by an Industrial Commission Form 22 Wage Chart, which has been submitted to the Industrial Commission, received into evidence, and marked as Stipulated Exhibit 4.
9. At the hearing before the Deputy Commissioner, the parties submitted a packet of plaintiff's medical records, which was admitted into the record and marked Stipulated Exhibit 2. Also admitted into the record were a Transcript of Plaintiff's Recorded Statement, Employment Security Commission Records, and Short Term Disability Records, collectively marked as Stipulated Exhibit 3.
 ***********
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 39 years old at the time of the hearing before the Deputy Commissioner. He was born September 26, 1962. Plaintiff began his employment as a machinist with Borg Warner on March 3, 1998. Borg Warner has not employed plaintiff since August 8, 2001.
2. Plaintiff's average weekly wage on October 28, 1999, pursuant to the submitted Form 22, was $590.31, yielding a compensation rate of $393.50 per week.
3. On October 28, 1999, plaintiff experienced pain in his left elbow while working as a machinist for Borg Warner. Plaintiff had complained to his supervisor and others previously about his elbow but the pain he experienced on that day was more severe, causing him to report an injury formally.
4. On that day, plaintiff was operating a machine known as a 103 New Britain, a six-spindled lathe used to process raw iron castings into mechanical parts. Plaintiff had operated the machine for several months prior to October 28, 1999. The general operation of the machine involved placing a raw iron casting weighing between seven and ten pounds on the machine, which is then "chucked," or locked, into place using a gage level. Once locked into position, the casting spins and is processed by the machine. This procedure required plaintiff to use his right hand to pick up a new casting out of a nearby box and maneuver it into place on the machine. While maneuvering the casting with his right hand, plaintiff would use his left arm to pull a lever to "un-chuck," or unlock, the casting, which then goes into a second machine of the same type where the process is repeated. Plaintiff's right arm would lift the castings, and his left arm would be used to operate the levers. Each of these levers was "sluggish" and hard to pull or push. Frequently plaintiff would have to use both hands to force the levers into position to engage the mechanisms.
5. Plaintiff processed approximately 250 to 300 castings in an eight-hour shift and up to 500 in a twelve-hour shift. Overall, each part required four movements of his left arm to chuck and un-chuck each part twice. Thus, plaintiff repeated the same pulling and pushing of the machine's lever anywhere from 500 to 1,000 times in a shift.
6. Following the pain he experienced on October 28, 1999, plaintiff sought treatment with Urgent Care in Haywood County on November 5, 1999. Plaintiff continued treatments at Urgent Care through November 29, 1999. On December 1, 1999, plaintiff began treatments with Dr. James Faulk, of Mountain Orthopaedics Associates, and continued to treat with Dr. Faulk through January 4, 2000.
7. Plaintiff was additionally examined by Dr. Christopher T. Lechner, of Carolina Hand Surgery Associates, on December 3, 1999. Plaintiff reported to Dr. Lechner that he had experienced pain and numbness in his left forearm and into his hand beginning in the middle of October 1999. Dr. Lechner initially diagnosed plaintiff as having radial neuritis of the left arm, which is an inflammation of a nerve that runs through the middle of the forearm. Dr. Lechner testified that radial neuritis can be caused by repetition. Plaintiff was prescribed medications, and restricted from working with vibrating tools or lifting greater than five pounds.
8. On January 7, 2000, plaintiff returned to Dr. Lechner because his radial neuritis symptoms had persisted, however the results of a nerve conduction study ordered by Dr. Lechner were normal. On January 19, 2000, Dr. Lechner noted that plaintiff was experiencing symptoms at his left elbow joint space, which caused Dr. Lechner to posit that plaintiff may have chondromalacia. Chondromalacia is a thinning of the cartilage in a joint, plaintiff's elbow joint in this case, which is often caused by a loose body in the joint. Symptoms of chondromalacia include severe pain and discomfort in using the affected joint. Based upon this differential diagnosis, Dr. Lechner injected plaintiff's elbow joint, and instructed him to return in four weeks.
9. On February 16, 2000, plaintiff returned to Dr. Lechner, and reported that he was still experiencing symptoms with his left elbow, including a catching or locking of the joint. This was consistent with Dr. Lechner's suspicion that plaintiff was suffering from chondromalacia. Following this examination, Dr. Lechner ordered an MRI.
10. The next day, February 17, 2000, plaintiff was involved in an unrelated altercation when he was attacked by a group of men without provocation. Plaintiff sustained injuries to his mandible, right hip, right leg, ribs, and back. However, plaintiff did not sustain any injury to his left arm or elbow during this event.
11. The Full Commission finds that plaintiff's chondromalacia condition pre-existed the February 17, 2000, altercation. Moreover, plaintiff did not sustain any trauma to his left arm or elbow as a consequence of the altercation. Thus, the Full Commission finds that the evidence of record does not establish that this incident had any effect on plaintiff's pre-existing chondromalacia condition.
12. On April 8, 2000, plaintiff had an MRI, as ordered by Dr. Lechner. The MRI showed a calcified loose body in plaintiff's left elbow joint, confirming Dr. Lechner's diagnosis of chondromalacia.
13. On April 25, 2000, Dr. Lechner performed an arthroscopic surgery on plaintiff's left elbow to remove the calcified loose body. Plaintiff was released to return to work by Dr. Lechner as of May 25, 2000, following recovery from his surgery.
14. Plaintiff returned to Dr. Lechner On May 31, 2000. He reported that the catching and clicking problem in his left elbow had resolved, but that he was having difficulty in working on the six-spindled lathe at Borg Warner. Due to concerns that plaintiff's work in that capacity could cause additional problems, Dr. Lechner wrote plaintiff a note to avoid working in that position.
15. On December 22, 2000, plaintiff reported to Dr. Lechner that he was again experiencing popping in his left elbow, for which he was prescribed Vioxx, an anti-inflammatory medication. Because Dr. Lechner suspected that plaintiff had another loose body in his elbow joint, a second MRI was taken on January 17, 2001. That test revealed another small fragment that was loose in plaintiff's left elbow joint. At that time, plaintiff reported to Dr. Lechner that he wanted to wait before undergoing another surgical procedure for his continuing chondromalacia.
16. On March 16, 2001, plaintiff was involved in an unrelated motor vehicle accident in which he sustained an injury to his back. The Full Commission finds the evidence of record does not establish this incident had any effect on plaintiff's pre-existing chondromalacia condition.
17. Following his course of treatment with Dr. Lechner, plaintiff received treatment from multiple physicians. The record shows plaintiff obtained a string of out-of-work notes regarding his elbow pain from Dr. Roger D. Jensen of Parkway Family Physicians for the period beginning February 8, 2001, through April 30, 2001, when plaintiff began treatment with Dr. Thomas J. Noonan.
18. On May 9, 2001, Dr. Noonan performed an arthroscopic surgery to remove the additional loose body from plaintiff's left elbow. Dr. Noonan released plaintiff to return to work without restrictions on June 6, 2001. At that time, plaintiff was still being treated by other physicians for unrelated back pain, and continued to be written out of work for such pain.
19. The evidence of record, including the medical notes of Dr. Margaret Burke of the Mountain Neurological Center, shows that plaintiff continued to be written out of work through August 20, 2001. However, the Full Commission finds that plaintiff was not written out of work for his elbow at any time after June 6, 2001.
20. Borg Warner terminated plaintiff on August 8, 2001, the date plaintiff's Family Medical Act leave ended. Borg Warner paid short-term disability to plaintiff from January 9, 2000, through May 21, 2000, and again from February 16, 2001, through May 29, 2001. Plaintiff has collected unemployment benefits since October 20, 2001, and through the date of hearing before the Deputy Commissioner.
21. Dr. Lechner testified, and the Full Commission finds as fact, that chondromalacia can be caused by repetitive trauma. As Dr. Lechner opined, the repetitive "flexion-extension could dislodge a piece of cartilage." Alternatively, even if plaintiff had loose calcified bodies in his elbow joint prior to working for Borg Warner, Dr. Lechner testified that the repetitive nature of plaintiff's duties could have exacerbated plaintiff's chondromalacia. Thus, the Full Commission finds that plaintiff's inability to work due to chondromalacia is due to the repetitive nature of his job duties during his employment with Borg Warner, which is characteristic of and peculiar to his employment as a mechanist.
22. Additionally, Dr. Lechner testified, and the Full Commission finds as fact, that chondromalacia in usually limited to athletes or people who use their arm a lot, and is most commonly seen in people who are more than 50 or 60 years of age. Thus, the Full Commission finds that chondromalacia in a 39-year-old non athlete is not an ordinary disease of life to which the general public is equally exposed but in this case became symptomatic and prevented plaintiff from earning wages due to exacerbation brought about by the repetitive use of plaintiff's hands and arms in his job.
23. Plaintiff sustained temporary total disability as a consequence of the occupational disease of chondromalacia for the periods of April 25, 2000, to May 25, 2000 (when plaintiff was written out of work to recover from his first elbow surgery), and again from February 8, 2001, to June 6, 2001 (for the periods plaintiff was written out of work prior to and following his second elbow surgery).
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In a claim regarding an occupational disease, the claimant must establish both that his disease is due to causes and conditions that are characteristic of and peculiar to a particular trade, occupation, or employment, and that it is not an ordinary disease of life to which the general public is equally exposed. Booker v. Medical Center, 297 N.C. 458,468, 256 S.E.2d 189, 196 (1979). The greater weight of the evidence establishes that plaintiff's chondromalacia is due to the repetitive nature of his job duties during his employment with Borg Warner, which is characteristic of and peculiar to his employment as a machinist, and that chondromalacia in a 39-year-old non athlete is not an ordinary disease of life to which the general public is equally exposed. Id. Thus, plaintiff's chondromalacia is a compensable occupational disease. N.C. Gen. Stat. §§ 97-2(6) and 97-53(13).
2. An employer must take his employee as he finds him, and the employer is liable for the full extent of a compensable injury even where a pre-existing condition substantially contributes to the degree of the injury. Frady v. Groves Thread, 56 N.C. App. 61, 286 S.E.2d, aff'd312 N.C. 316, 321 S.E.2d 835 (1984). Thus, even if plaintiff's chondromalacia pre-existed his employment with Borg Warner, the repetitive nature of plaintiff's job duties likely exacerbated plaintiff's condition and made it disabling. Id.
3. Plaintiff sustained temporary total disability during the periods of April 25, 2000, to May 25, 2000, and from February 8, 2001, to June 6, 2001, as a consequence of his occupational disease. Plaintiff is entitled to compensation at the rate of $393.50 per week for these periods of temporary total disability. N.C. Gen. Stat. § 97-29.
4. Defendants are entitled to a credit for any short-term disability compensation paid to plaintiff through Borg Warner's employer-funded short-term disability plan during the above-mentioned periods of temporary total disability. N.C. Gen. Stat. § 97-42.
5. Because the unemployment benefits paid to plaintiff did not commence until after plaintiff's period of temporary total disability had terminated, no credit for such benefits is warranted. N.C. Gen. Stat. § 97-42.1.
6. As a result of plaintiff's compensable occupational disease, defendant is liable for related medical treatment that was reasonably necessary to effect a cure, give relief, or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay temporary total disability compensation to plaintiff at the rate of $393.50 per week for the periods of April 25, 2000, to May 25, 2000, and from February 8, 2001, to June 6, 2001, subject to the attorney's fee approved below. Because this compensation has accrued, it shall be paid in a lump sum with interest at eight percent (8%) per annum from January 15, 2002, the date of the hearing before the Deputy Commissioner.
2. Defendants shall be credited on a week-for-week basis for any short-term disability compensation paid to plaintiff through Borg Warner's employer-funded short-term disability plan during the periods of temporary total disability compensation awarded to plaintiff in paragraph 1 of this award.
3. Defendant shall pay to plaintiff's counsel in one lump sum a reasonable attorney's fee in the amount of twenty-five percent (25%) of the accrued compensation as awarded to plaintiff in paragraph 1 of this award. Plaintiff himself is to receive all the interest due.
4. Defendant shall pay for medical expenses incurred as a result of the compensable injury to plaintiff's elbow as was reasonably required to effect a cure, provide relief, or lessen the period of disability.
5. Defendant shall pay the costs.
This 26th day of March 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER